# IN THE TENNESSEE COURT OF CRIMINAL APPEALS

## AT KNOXVILLE

## SPECIAL SEPTEMBER SESSION, 1998

FILED

June 25, 1999

Cecil Crowson, Jr.
Appellate Court
Clerk

| | | |
|---|---|---|
| NICHOLAS TODD SUTTON, | ) | C.C.A. NO. 03C01-9702-CR-00067 |
| | ) | |
| Appellant, | ) | MORGAN COUNTY |
| | ) | (No. 7555 Below) |
| VS. | ) | |
| | ) | HON. GARY R. WADE, SPECIAL JUDGE |
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | (Post-Conviction, Death Penalty) |
| | ) | |

## ON APPEAL FROM THE JUDGMENT OF THE
## CRIMINAL COURT OF MORGAN COUNTY

FOR THE APPELLANT:

JOHN E. ELDRIDGE
ELDRIDGE, IRVINE & HENDRICKS
Suite 350, Main Place
606 Main Street
P.O. Box 84
Knoxville, TN 37901-0084

MICHAEL J. PASSINO
LASSITER, TIDWELL & HILDEBRAND
213 Fifth Avenue, North
Nashville, TN 37219-1901

FOR THE APPELLEE:

JOHN KNOX WALKUP
Attorney General & Reporter

MICHAEL E. MOORE
Solicitor General

JOHN P. CAULEY
Assistant Attorney General
425 5th Avenue North
Nashville, TN 37243-0493

CHARLES E. HAWK
District Attorney General

D. ROGER DELP
Assistant District Attorney General

FRANK A. HARVEY
Assistant District Attorney General
P.O. BOX 703
Kingston, TN 37763-0703

OPINION FILED _____

AFFIRMED

JOHN K. BYERS, SENIOR JUDGE

In this capital case, the petitioner, Nicholas Todd Sutton, appeals as of right from the judgment of the Criminal Court of Morgan County denying his post-conviction petition.  In 1986, the petitioner was convicted of first-degree murder and sentenced to death by electrocution.  The petitioner's conviction and sentence were affirmed on direct appeal by the Supreme Court.  See State v. Sutton, 761 S.W.2d 763 (Tenn. 1988), reh'g denied (Tenn. 1988), and cert. denied, 497 U.S. 1031, 110 S.Ct. 3287, 111 L.Ed.2d 796 (1990).

On December 14, 1990, the petitioner, through counsel, filed a petition for post-conviction relief, and an amended petition was filed on January 2, 1992.  Thereafter, Senior Judge William H. Inman was appointed to hear the petition on November 18, 1994.  In March 1996, Judge Inman granted the petitioner's motion requesting that he recuse himself, and Judge Gary R. Wade was appointed to hear the petition. The post-conviction hearing was held over a period of five days from October 9 to October 14, 1996.  On October 23, 1996, the post-conviction court denied post-conviction relief.

On appeal, the petitioner raises the following issues:

1.  Whether the state abused the discovery process, mislead and misdirected the energies of petitioner's attorney, and concealed the state's major witnesses, and whether the post-conviction court erred in concluding that the issue had been previously determined.

2.  Whether the trial court failed to regulate the discovery process, and whether the post-conviction court erred in concluding that the issue had been waived or previously determined.

3.  Whether excessive courtroom security denied the petitioner his right to a fair trial, and whether the post-conviction court erred in concluding that the issue had been waived or previously determined.

4.  Whether the petitioner was denied the effective assistance of counsel at the guilt and penalty phases of his trial.

5.  Whether the state falsely portrayed inmate safety and security at the prison.

6. Whether the state manufactured a prior statement by inmate Lumbert for the post-conviction hearing, and whether the post-conviction court erred by failing to address the issue.

7. Whether the state failed to disclose exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

8. Whether the death penalty statutes are unconstitutional.

9. Whether imposition of the death penalty in this case would be arbitrary and capricious.

Having reviewed the record, including the record from the petitioner's direct appeal, we affirm the judgment of the post-conviction court.

**Background**

The proof, as set forth in the Supreme Court's decision, State v. Sutton, 761 S.W.2d 763, 765-66, established that the petitioner and co-defendants Charles A. Freeman and Thomas A. Street were residents of Guild 6 at the Morgan County Regional Correctional Facility ("MCRCF") on the day of the murder. The victim, Carl Estep, was a resident of Guild 5.

On January 15, 1985, when Estep was murdered, there was no correctional officer in Guild 5 between 9:30 and 10:00 a.m. During a routine "shakedown" after 10:00 a.m., correctional officers found the body of Estep lying on the lower bunk of his cell. There were signs of a struggle and blood was observed on the wall, the bed covers, and on Estep's body. Attempts to revive Estep were unsuccessful. The entire facility was then "locked down," and all inmates in Guild 5 were interviewed.

Estep, who had been serving a sentence for child molesting, had been stabbed thirty-eight times in the chest and neck. Most of the wounds were superficial, but nine were potentially fatal, having penetrated Estep's lungs, vena cava, and carotid artery. The examining pathologist testified that this latter wound would have caused death in a

2

matter of minutes. There were seven defensive wounds on Estep's hands and right arm and a wound to the back of his head caused by a blow. It was the opinion of the pathologist that from the size of the wounds, two knives had been used by Estep's attackers. On the bottom bunk, investigating officers found two homemade knives, which matched the wounds on Estep's body. A later investigation of the cell uncovered a third knife hidden under a lamp beside Estep's bed.

The testimony of four inmates, sometimes contradictory and evasive, linked the petitioner to the murder. The first to testify was Harold Meadows, a resident of Guild 5. He testified that he was sitting in the day room area when he saw the petitioner and Street enter the guild and go straight to Estep's cell. He stated that each day between 9:30 a.m. and shortly after 10:00 a.m. there was a period of five to ten minutes when no guards were in Guild 5 due to a duty change. It was during this time on January 15, that he observed the petitioner and Street enter the guild. When they entered Estep's cell, his roommate immediately came out and shortly thereafter the volume of the tv or radio increased, and Meadows heard a scream, and the petitioner and Street came out. When questioned by correctional officers immediately after the incident, Meadows told them what he had seen and identified the petitioner and Street from a photographic line-up. Meadows further testified that on Sunday, January 13, he had seen Estep having a "physical discussion" with the petitioner and Street, during which the petitioner held a knife to Estep's throat.

Another resident of Guild 5, Estel Green, testified that he was standing in front of the door to his cell, right next to Estep's cell, when he saw the petitioner and another inmate go inside Estep's cell. Green then went into his cell. When he came back out, he saw the other men in the guild moving toward the back away from Estep's cell. Green moved away with them and heard Estep "holler out. He said, 'Don't do that; please don't do that.' and then he hollered louder, he hollered, 'Somebody help me; somebody please help me.' and that was all I heard." Green was not able to see who left Estep's cell.

3

Ralph Edward Scates was a resident of Guild 3, but he worked as a laundry man in Guild 1. Scates testified that he had a casual conversation with Street while Street was confined to Guild 1 for investigative purposes after the killing. Street admitted to Scates that "he [Street] cut him ... he stuck him, cut his throat." Street said that homemade knives had been used and that he had tried to flush his down the commode in his cell in Guild 6. Scates stated that the petitioner had told him, "The SB got exactly what he deserved."

The last inmate to testify for the state was Cary Scoggins. He testified that Estep was a marijuana dealer at the facility and had sold the defendants some "bad merchandise" and had refused to refund the defendants' money. He testified that after the defendants took Estep's watch and some other articles, Estep had threatened to kill the petitioner. Scoggins, a resident of Guild 6, happened to be in Guild 5 on the morning of January 15 between 9:30 a.m. and 10:30 a.m. He stated that he saw the petitioner, Street, and Freeman come into the guild and enter Estep's cell. He looked through the window in the door of Estep's cell, a vertical window four inches by thirteen inches and saw all three defendants standing in front of the bunk bed with their backs to the window. He saw Estep try to get up from the bottom bunk and the petitioner and Freeman pulled knives. The petitioner started to stab Estep, who screamed. Scoggins stated that the petitioner "just kept on stabbing" about sixteen times. The three defendants then washed their hands in the sink. Scoggins then moved away from the door and left the guild before the defendants did.

In order to contradict Scoggins' testimony, co-defendant Freeman presented the testimony of Gary Lumbert, Scoggins' cellmate. Lumbert testified that Scoggins was working with him in the prison library at the time Estep was murdered.

The state recalled James Worthington, the administrative assistant to the warden at the time of the killing, and he testified that he had investigated the murder. He stated that Lumbert had told him that he was present in Guild 6 immediately after Estep

4

had been killed, and that he observed the petitioner and Street enter the guild, remove their clothes, and place their clothes in the laundry. Lumbert also told Worthington that the petitioner bragged "about stabbing Carl Estep twenty-some times."

On January 15, two garbage bags found outside Guild 8 were brought to Worthington, one containing trash and the other prison clothing. A telephone pass for Freeman was found in one pair of the pants. F.B.I. analysis of the debris from the clothing in the garbage bag revealed a hair consistent with that of the victim on a pair of button-fly jeans and a hair consistent with that of Freeman on one of the jackets. A forensic serologist employed by the T.B.I. testified that she was able to identify a human blood stain matching the victim's blood type on the sleeve of one of the jackets, one of the knives, and a work shirt. She also found human blood on one of the jackets, a pair of zipper-fly blue jeans and an elastic bandage. Tests were inconclusive as to whether human blood was on the other knife.

Based on this proof, the jury found the petitioner guilty of first-degree murder.

At the sentencing hearing, the state presented proof that the petitioner had previously been convicted of first-degree murder. The defense presented the testimony of Charles Burchett, the Director of Student Conduct at the University of Tennessee, his wife, a semi-retired school teacher, and their son, Charles Burchett, Jr., who was a real estate agent. The Burchetts testified that they had known the petitioner since he was in high school and that they visited him in prison regularly. The defense also presented the testimony of two inmates. Eddie O'Donnell, the petitioner's cellmate in Guild 6, testified that on January 14, while they were eating in the dining hall, the petitioner asked O'Donnell to tell him if Estep came toward him. When Estep came in, O'Donnell nodded at the petitioner, who stood up. Estep then walked the other way. James "Buddy" Williams, also an inmate, testified that he did not have any conversations with the petitioner about this matter, despite having previously told defense counsel that he had in fact had conversations with the petitioner. Williams refused to answer any further questions.

5

The jury sentenced the petitioner to death by electrocution based on its finding that there were no mitigating circumstances sufficient to outweigh the three aggravating circumstances: (1) prior conviction of a violent felony, (2) the murder was heinous, atrocious, or cruel, and (3) the murder was committed while the petitioner was in a place of lawful confinement. T.C.A. § 39-2-203(i)(2), (5), (8) (repealed 1989).

## Standard of Review

In post-conviction proceedings, the petitioner must prove the allegations contained in his petition by a preponderance of the evidence. Oliphant v. State, 806 S.W.2d 215, 218 (Tenn. Crim. App. 1991). Findings of fact and conclusions of law made by the trial court are given the weight of a jury verdict, and this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899 (Tenn. 1990). This Court may not reweigh or reevaluate the evidence or substitute its inferences for those drawn by the trial court. Questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution by the trial court. Black v. State, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990).

## I. Prosecutorial Misconduct

In his first issue, the petitioner contends that he was denied a fair trial because the state abused the discovery process, mislead and misdirected the energies of petitioner's attorney, and concealed its major witnesses. The petitioner submits that the post-conviction court erred in finding this issue to be previously determined.

Specifically, the petitioner argues that he was unable to establish his prosecutorial misconduct claim on direct appeal because he was denied access to material documents which would have demonstrated an intentional decision by the state to misdirect defense counsel. Second, the petitioner argues that he was unable to show in

6

the prior proceedings how he was prejudiced by the intentional wrongdoing of the state because his attorney could not challenge his own ineffectiveness without creating a conflict of interest.

Under the Post-Conviction Procedure Act governing this petition, a petitioner could raise all constitutional claims except those which had been previously determined, waived, or barred by the statute of limitations. The statutory definitions under the applicable Post-Conviction Procedure Act for previous determination and waiver were as follows:

> (a) A ground for relief is "previously determined" if a court of competent jurisdiction has ruled on the merits after a full and fair hearing.
>
> (b)(1) A ground for relief is "waived" if the petitioner knowingly and understandingly failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented.
>
> (2) There is a rebuttable presumption that a ground for relief not raised in any such proceeding which was held was waived.

T.C.A. § 40-30-112 (1990).

In House v. State, 911 S.W.2d 705 (Tenn. 1995), our Supreme Court held that "a 'full and fair hearing' sufficient to support a finding of previous determination occurs if a petitioner is given the opportunity to present proof and argument." Id. at 706. The burden is on the post-conviction petitioner to allege facts to overcome the application of procedural barriers. Smith v. State, 814 S.W.2d 45, 49 (Tenn. 1991); see also T.C.A. § 40-30-104(10)(1990).

The post-conviction court concluded that the petitioner failed to rebut the finding that the issue had been previously determined on direct appeal, where our Supreme Court held:

7

The defendant Sutton next alleges that he was denied the right to a fair trial because of the conduct of the State in not supplying him sufficient notice of the witnesses which would be used against him. He argues that by providing lists of numerous prospective witnesses, ranging from 80 to 47 names, many of whom were inmates scattered throughout the State correctional system and most of whom the State, defendant alleges, had no intention of calling, denied him his right to effective counsel because defense counsel was unable to interview all these witnesses and investigate the case fully. Nothing in the record supports this allegation. When defense counsel pointed out the problems he was having in reaching all the witnesses, the court granted a continuance.

Sutton, 761 S.W.2d 763, 769.

Despite the petitioner's claims, a full review of the record does not establish intentional wrongdoing on the part of the state. Worthington testified that he was responsible for the prison's internal investigation into the murder of Estep. On the day of the murder, Worthington and Clarence Robbins, the investigator for the district attorney general's office, conducted intensive interviews of everyone in Guild 5. Worthington was responsible for transcribing and cataloging all of the statements.

In the course of the investigation, Worthington submitted to the district attorney general's office a list of possible witnesses and a summary of each witness' potential testimony. Worthington kept a notebook which included summaries, statements, and documents regarding each person who was interviewed. In addition, he kept miscellaneous files that included rap sheets, different information, institutional file documents on each of the defendants and some of the witnesses, and notes he had made during the investigation and interviews.

The list of potential witnesses was typed and sent to the district attorney general's office around June 3, 1985. Worthington testified that the entire list was given to the defense as a good faith effort so the defense would have a complete list of the inmates who had been interviewed. A shorter list was given in August 1985, and another was given in September 1985. Worthington kept inmates on the witness list because he thought that once some of them were released from prison they might be willing to talk.

8

He also believed that the defense attorneys should be given an opportunity to speak with these inmates because they might tell defense counsel more than they would tell the prison officials.

Roger Delp, an assistant district attorney general who prosecuted the case, testified that the long list of potential witnesses was given to defense counsel to ensure that the trial judge would not refuse to allow a witness to testify because the name had not been given to the defense. The state was concerned that some inmates who had been in a position to have information about the homicide but were not talking might be willing to talk to defense counsel or might decide to talk to the state at a later date. The state was also trying to protect inmates from potential retaliation.

The petitioner was represented at trial by John Appman. Because the state's list of potential witnesses was long and because the inmates were constantly being transferred to other facilities, Appman spent unnecessary time and trouble investigating the case. Bruce Fox, appointed counsel for co-defendant Street, confirmed that it was difficult to prepare for trial because the state's witness list was so extensive. He and Appman did most of the preparation for trial, traveling in Appman's private plane to interview witnesses who were incarcerated at various correctional facilities across the state. They were also assisted by Appman's paralegal.

In order to tell which witnesses the state was going to call and to have an understanding of the state's case, Appman believed he needed to review Worthington's investigative records. However, even if he had been able to obtain a shorter list of potential witnesses, Appman testified that he still would have attempted to talk to anyone who might have benefitted the case. He and Herb Moncier filed a motion with the trial court in an attempt to get Worthington's notebook, however, the motion was denied. Thereafter, they filed a lawsuit in the chancery court of Davidson County seeking to force Worthington to turn over his investigative records under the Public Records Act. Relief was denied by the chancery court and by the Supreme Court on appeal. See Appman v.

9

Worthington, 746 S.W.2d 165 (Tenn. 1987).

Without Worthington's notebook, Appman testified that he was unable to fully advise the petitioner regarding the strength of the state's case. Although the petitioner testified that he would not have accepted the state's offer of a life sentence because it was conditional on offers to the co-defendants, Appman believed that the information in Worthington's notebook would have assisted him in his attempt to convince the petitioner to accept the offer. Despite the foreclosure of reviewing Worthington's notebook, Appman was able to interview all the inmates who eventually testified at trial on behalf of the state. He was also able to review each of these witnesses' statement to Worthington as Jencks material prior to cross-examination.

A review of the testimony and of Worthington's notebook does not reveal that the state intentionally misdirected defense counsel, and this argument fails to rebut the statutory presumption that this issue has been previously determined.

Next, the petitioner contends that the issue should not be barred as previously determined because counsel could not have raised his own ineffective assistance of counsel. However, the issue of whether the state's actions denied the petitioner the right to effective counsel was raised and addressed by the Supreme Court. Sutton, 761 S.W.2d 763, 769. Moreover, the record reflects that Appman took every action possible to obtain Worthington's notebook, including the filing of a civil law suit. Accordingly, even if the issue was not previously determined, the petitioner has failed to show that counsel's actions were deficient. See Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

## II. Regulation of Discovery Process

The petitioner contends that the post-conviction court erred in finding that the issue of whether the trial court failed to regulate the discovery process was previously

determined, waived, or without merit.  As to a finding of waiver, the petitioner contends that it was not raised due to ineffective assistance of counsel and that the material facts supporting his claim were not available despite efforts to obtain access to the information. Furthermore, the petitioner contends that if the trial court had at a minimum reviewed Worthington's notebook or included it in the record, it would have shown that the state had in fact prepared a shorter, detailed witness list which set forth the anticipated witnesses at trial and their anticipated testimony.

As noted in the Supreme Court's opinion, "[t]he evidence in the record does not preponderate against the trial court's finding on the motion for new trial that there was no bad faith on the State's part in responding to the discovery requests, that the defendant was not damaged by any of the delays in this case, and that under the circumstances all matters were addressed within a reasonable time."  Sutton, 761 S.W.2d 763, 768. Accordingly, this issue has been previously determined. See T.C.A. § 40-30-112(a)(1990). Furthermore, the petitioner cannot succeed on a claim of ineffective assistance of counsel because the Supreme Court ruled that matters of discovery were handled appropriately. Thus, the petitioner has not shown prejudice.  Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984).

### III.  Courtroom Security

Next, the petitioner contends that the post-conviction court erred in concluding that the issue of excessive security in the courtroom was previously determined, waived, or without merit.  In his post-conviction petition, the petitioner claimed that the state used the extraordinary courtroom security as a prop, that he was denied a fair trial as a result of the excessive courtroom security, that the trial court failed to regulate the excessive courtroom security, and that defense counsel was ineffective in failing to limit the excessive security, object to its use as a prop, or properly present the issue in the motion for new trial and on direct appeal.

11

Regarding this issue, Charles E. Jones, now warden at MCRCF, testified that he was in charge of courtroom security during the petitioner's trial. According to Jones, the goal was to provide security during the trial and to ensure that inmates were transported in a timely manner, however, there was no written plan or order. Uniformed officers armed with shotguns were stationed at each corner of the courthouse. Two officers with a hand held metal detector were stationed outside the door to the courtroom. Inside the courtroom, officers were stationed at each door. Three more officers were stationed in the front row directly behind the defendants. One officer was positioned to backup the three officers by the defendants, one was next to the jury, and two were in the balcony. Some of the officers were in uniform, and all the officers were armed with the exception of the three officers directly behind the defendants. One street by the courthouse was blocked off, and the officers used it for parking and unloading inmates.

Judge Eugene Eblen, who presided over the trial, testified that the officers in the courtroom were not overly conspicuous. Considering that there were three inmates on trial and that many of the witnesses were also inmates, Judge Eblen believed that the security was appropriate.

Contrary to this testimony, Fox, counsel for co-defendant Street, testified that the courthouse was an "armed fortress." Charles Burchett, who attended the trial and testified on behalf of the petitioner at the sentencing hearing, testified that he was amazed at the number of armed officers.

On the general issue of courtroom security, the post-conviction court made these findings:

> Even if the issue had not been previously determined or waived, the proof at the evidentiary hearing simply did not establish this as a ground for relief. Obviously courtroom security is necessary when three prison inmates are on trial. All of the key witnesses were inmates as well. The environment at the trial, due to all this, was certainly not ideal. Nonetheless, the trial court took measures to reduce any prejudicial effect. The defendants wore certain clothes, their hands were free, and measures were taken to hide from the jury the shackles on their feet. Moreover, Morgan County, with two state

12

prison facilities in 1986, is more likely than other counties to be desensitized to a possibly coercive atmosphere.

Before introducing the homemade knives into evidence, General Harvey placed them on the defense table so that defense counsel would have an opportunity to examine the knives. This was done even though defense counsel had been instructed to only use felt tip pens, not pencils, so that the defendants could not use the pencils as weapons in taking hostages. Appman testified that he reacted by jerking away from the table because he was afraid of becoming a hostage. According to Appman, it was a tense moment in the courtroom. Being startled, Appman did not make a motion for a mistrial or raise the issue at that time.

Judge Eblen testified that it is common practice for lawyers to approach opposing counsel and present an exhibit before it is introduced into evidence. When the prosecutor placed the homemade knives on the defense table, Judge Eblen saw Appman jump, and he heard an officer pull a gun, although he did not see any guns drawn. According to Judge Eblen, the courtroom quickly quieted down, and the jury seemed to get a "smile" out of the incident. Judge Eblen believed that he told the prosecutor not to do it again.

The post-conviction court accredited the testimony of Judge Eblen on this issue:

> Moreover, Judge Eblen testified that this was really "not a big event in Morgan County" and that the "officers were not overly conspicuous." While Judge Eblen expressed some concern about the incident wherein an assistant district attorney general placed several knives at the table occupied by the defendants and their counsel, John Appman reacted with some surprise. The record demonstrates, however, that there were curative instructions. It was Judge Eblen's opinion that the incident did not affect the results of the trial. This court accredits that account.

Regarding the placing of knives on defense table, the post-conviction court properly held that the issue has been previously determined. T.C.A. § 40-30-112(a)

13

(1990). In fact, Jones was called to testify about the courtroom security at the hearing on the motions for new trial. Jones, who was in charge of courtroom security, testified that there were ten to fourteen guards in the courtroom, some of whom were in civilian clothes. While some of the guards had pistols, no one in the courtroom had a shotgun. When the knives were placed on the table, the officers in the courtroom reached for their guns, however, no pistols were drawn. On direct appeal, the Supreme Court ruled:

> The defendant also alleges prosecutorial misconduct by the Assistant District Attorney General. A knife, identified by State's witness James Worthington as a weapon found in Estep's cell after the murder, was placed on the defense table for inspection by counsel before passing it to the jury. Seeing the knife within reach of the defendants, a number of the correctional officers in the courtroom responded by reaching for their weapons. Defendant insists that the reactions by the guards prejudiced him and deprived him of the "physical indicia of innocence." After the incident, the court instructed the State to have defense counsel examine the weapons at the State's table. The jury knew that the defendants were inmates and it probably came as no surprise to the jurors that they would be closely watched and guarded. The record reflects that only one such incident occurred. We do not find that this incident could have so prejudiced the defendant as to deny him a fair trial. We find no reversible error.

State v. Sutton, 761 S.W.2d 763, 769.

Furthermore, as held by the post-conviction court, all other claims regarding excessive security in the courtroom were waived by the petitioner's failure to raise them previously. T.C.A. § 40-30-112(b)(1) (1990). Finally, the petitioner has failed to meet his burden to show ineffective assistance of counsel regarding this issue. As stated earlier, on appeal from the denial of post-conviction relief, the findings of fact and conclusions of law made by the trial court are given the weight of a jury verdict, and this Court is bound by those findings unless the evidence contained in the record preponderates otherwise. Butler v. State, 789 S.W.2d 898, 899. Questions concerning the credibility of witnesses and weight and value to be given their testimony are for resolution by the trial court. Black v. State, 794 S.W.2d 752, 755.

In the present case, the post-conviction court accredited the testimony of Judge Eblen regarding whether the security was excessive or prejudicial at the petitioner's

14

trial.  Having reviewed the record, we do not find that the evidence preponderates against this finding, and thus, the petitioner has failed to establish prejudice.  Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067.  This issue is without merit.

## IV.  Ineffective Assistance of Counsel

The petitioner raises several issues regarding the effectiveness of defense counsel pre-trial, at trial, post-trial, and on direct appeal.  When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936.  Second, he must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067 (1984).  There must be a reasonable probability that but for counsel's error, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. at 694, 104 S.Ct. at 2068; Best v. State, 708 S.W.2d 421, 422 (Tenn. Crim. App. 1985).  Should the petitioner fail to establish either factor, he is not entitled to relief.

## (A)  Failure to File a Motion to Strike "Lawful Custody" Aggravating Circumstance

The petitioner contends that counsel was ineffective by failing to research, investigate, and/or file a motion seeking to strike the aggravating circumstance that the petitioner was in lawful custody at the time of the offense.  Despite defense counsel's self-defense theory that the victim's death threats had to be taken seriously because the prison was so dangerous and there was no place where inmates were safe, counsel failed to investigate or challenge the state's use of this aggravating circumstance.  The petitioner further argues that evidence of prison conditions could have been used to mitigate the circumstances of the crime at both the guilt and sentencing phases.

In denying relief, the post-conviction court held:

15

This ground does not serve as a basis for post-conviction relief. That the prison was less safe than most other places would not have excused the murder. There was some proof at trial that the prison had a dangerous atmosphere, requiring vigilance on the part of the inmates. This court does not disagree. But that would not have warranted striking this particular aggravating circumstance. See Tenn. Code Ann. § 39-2-203(i)(8)(1982). Thus, there is neither deficiency in performance on the part of trial counsel nor prejudice in result.

We find that the post-conviction court's findings are supported by the record. Initially, counsel for the petitioner investigated the conditions at the prison. Every inmate who testified at the guilt and sentencing phases was asked questions regarding safety and the meaning of a threat in prison. Moreover, defense counsel presented the testimony of Carl Crafton, a long-term inmate, who was qualified as an expert on prison life. Crafton explained the seriousness of a death threat in prison. However, Appman was not aware that the state of Tennessee had hired Frank Wood in 1985 to perform an evaluation of the prison system. At the post-conviction hearing, the petitioner presented Wood's testimony regarding his findings. As part of his evaluation, Wood visited nine institutions, including MCRCF.

Based on his inspection, Wood found serious deficiencies in the Tennessee Department of Correction ("TDOC"), especially regarding overcrowding. Wood found that the number of inmates was beyond the design capacity of the facilities. Moreover, the classification systems were nonfunctional. Inmates were not assigned to appropriate institutions, and exceptions were made constantly. As part of this problem, institutions were being used to house inmates who were beyond the classification for which the institution was designed. There was also an unusually high volume of inmate movement and transfers between institutions. The violence at the prisons was systemic, with a high frequency of assaults on staff and on other inmates. There was also an extremely high turnover among uniformed staff.

Wood noted that an unusual number of inmates in the system were requesting voluntary protective custody. Because of the punitive segregation status and because an inmate could end up being in protective custody for years, Wood opined that

16

it would take a high level of motivation for an inmate to commit himself to voluntary segregation as the only option for protecting himself. Such a person might become preyed upon as a victim personality or as someone who may not be able to handle prison life without resorting to protective custody.

At MCRCF, Wood found overcrowding and staff shortages. The physical plant was not designed to keep the classification of inmates that were there. Units were left unattended at different times during the day. In Wood's opinion, MCRCF was held together at the time because of the commitment and hard work of the warden and staff to maintain a rapport with the inmate population.

In reviewing the petitioner's files from TDOC, it was Wood's opinion that the petitioner had been inappropriately classified based on his history of violent behavior. The petitioner should have been in a situation where there was adequate staffing, supervision, control, and accountability for his behavior. In Wood's opinion, a person serving a life without parole sentence should not be housed in a medium security facility. While Wood did not think that the conditions at MCRCF mitigated the petitioner's actions, he did think that the system had a responsibility to control inmates like the petitioner and that the state should hold some culpability for the way the institution was managed. The poor management put other inmates in danger and also failed to provide the petitioner with the appropriate level of control.

Appman's theory at trial was based on reasonable doubt, but that if the petitioner did commit the homicide, it was self-defense. He testified that if he had received Wood's report on prison conditions, he could have shown the jury that the tension in prison was enormous and that the petitioner's reaction was normal under the circumstances. Moreover, he could have shown that the violence was not directed toward the officers, which would have been important because of the high number of people in Morgan County who were employed by TDOC.

In addition to Wood's report, Appman did not know about Grubbs v. Bradley, 552 F.Supp. 1052 (M.D. Tenn. 1982), in which the federal court addressed the issue of prison conditions, including overcrowding and violence, in TDOC. At the post-conviction hearing, the petitioner presented considerable proof on the conditions in TDOC, however, in preparing for trial, Appman had not reviewed these materials. He admitted at the hearing that this information would have assisted in the defense of the petitioner in that it would have further explained the environment in which the homicide occurred.

While this additional information regarding prison conditions would have supported Crafton's testimony, it would not have provided a basis for striking the aggravating circumstance. The petitioner has not shown that proof of dangerous prison conditions would warrant a ruling that the murder did not occur while the petitioner was in lawful custody, and he has failed to show that counsel's performance was deficient or that he was prejudiced.

**(B) Failure to Prepare for and Present Evidence at the Sentencing Hearing**

The petitioner contends that counsel's failure to conduct any investigation of the petitioner's medical, family, social, educational, juvenile, military, institutional, or prior criminal history, and defense counsel's decision not to present such evidence at the sentencing hearing was not an informed decision, was facially deficient, and prejudiced the petitioner.

In death penalty cases, the sentencer may not be precluded from considering any aspect of a defendant's character or record as a basis for a sentence less than death. Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978) (plurality opinion); see also Johnson v. Texas, 509 U.S. 350, 361, 113 S.Ct. 2658, 2666, 125 L.Ed.2d 290 (1993). The United States Supreme Court has held that mitigating evidence is relevant to sentencing hearings and should be heard. See California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); Eddings v. Oklahoma, 455

18

U.S. 104, 113-15, 102 S.Ct. 869, 876-77, 71 L.Ed.2d 1 (1982). "Evidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse.'" Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (quoting California v. Brown, 479 U.S. 538, 544, 107 S.Ct. at 841).

There is no legal requirement and no established practice that the accused must offer evidence at the penalty phase of a capital trial. State v. Melson, 772 S.W.2d 417, 421 (Tenn. 1989). In fact, in many death penalty cases, counsel has properly seen fit not to offer any evidence at the penalty phase. Id. at 421 (citations omitted).

However, "[a] strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless." Tafero v. Wainwright, 796 F.2d 1314, 1320 (11th Cir.1986). Courts have held counsel's representation beneath professionally competent standards when sentencing counsel did not conduct enough investigation to formulate an "accurate life profile" of a defendant. See Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995).

In Goad v. State, 938 S.W.2d 363, the Supreme Court set forth the following factors to consider in determining whether the petitioner was prejudiced by counsel's deficiencies: (1) the nature and extent of available mitigating proof that was not presented, (2) whether substantially similar mitigating proof was otherwise presented to the jury, and (3) whether there was strong evidence of aggravating factors so that "the mitigating evidence would not have affected the jury's determination." Id. at 371.

These factors were applied in Henley v. State, 960 S.W.2d 572 (Tenn. 1997), cert. denied, ___ U.S. ___, 119 S.Ct. 82, 142 L.Ed.2d 64 (1998), where the defendant was convicted of aggravated arson and two counts of premeditated murder. "At trial Henley maintained his innocence and attempted to discredit the prosecution's evidence." Henley,

960 S.W.2d at 574. At the penalty phase, the defense called the defendant's mother to the stand. In the presence of the jury, she disrupted her own testimony by announcing that she wanted "to talk to" defense counsel. A recess was had, followed by the defense resuming its proof by calling the defendant's grandmother, without explaining the failure of the defendant's mother to return to the stand. The grandmother testified to various attributes of the defendant, and the defendant himself testified about a financial reversal that caused him to lose his grandfather's farm. Id. at 575-76. The jury sentenced the defendant to death, based upon finding one aggravating factor in each homicide, that each murder was "'especially heinous, atrocious, or cruel in that it involved torture or depravity of mind.'" Id. at 576; see T.C.A. § 39-2-203(I)(5) (repealed 1989). In his post-conviction proceeding, Henley alleged his counsel failed to investigate and prepare for the sentencing hearing, including the claims that counsel failed to investigate his mental condition and request an appropriate evaluation.

Henley presented two expert witnesses at the post-conviction hearing: (1) an attorney, who testified that trial counsel should have used a psychologist to assist in determining if mitigating proof might be feasible; and (2) a psychiatrist, who interviewed Henley and testified that, at the time of the offenses, he suffered from depression and may have been "'self-medicating' by using alcohol and drugs." Id. at 577. This latter witness also found that Henley may have had a learning disability which may have been responsible for his failure at farming which, in turn, caused his depression. Id.

In addressing the prejudice issue first, see Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, the Supreme Court found that any failure of counsel to call as witnesses family members, some of whom testified at the post-conviction hearing about the positive attributes of the defendant, was not prejudicial. Utilizing the first and second prongs of the three-prong test provided in Goad, the Court noted that the proposed evidence not only duplicated but perhaps, due to its nature, would have diminished the poignant testimony of Henley's grandmother. Further, regarding the nature of the proposed testimony, the Court acknowledged the principle of California v. Brown, 479 U.S. 538, 544, 107 S.Ct. 837,

841, that a disadvantaged background is often a proper source of mitigating evidence but expressed concern about the quality of witnesses having a limited relationship with Henley or having personal knowledge about his drug use at the time of the crimes. At this juncture, the Court declared that "[a]ppellate courts must consider the quality of the proposed testimony rather than the quantity of witnesses when determining whether prejudice has been established." Henley, 960 S.W.2d 572, 582.

As to the third prong, the Henley court observed that the proof of the aggravating circumstance was strong. Id. The defendant killed an elderly couple. He shot them several times and then burned them by setting fire to their house. The Court found ample support for the single aggravating circumstance that the crime was especially heinous, atrocious, or cruel, involving torture or depravity of mind. Id.

Like in Henley, this Court has addressed the prejudice issue first, see Strickland, 466 U.S. 663, 697, 104 S. Ct. 2052, 2069, and we find that the petitioner has failed to show prejudice. Thus, there is no need to evaluate whether counsel's performance was deficient. Id.

At the post-conviction hearing, Appman testified that he presented all the mitigating proof available to him at the time. In preparing for the sentencing hearing, he obtained Estep's prison file and spoke with either Estep's mother or wife, as well as the attorney representing them in a victim compensation lawsuit. He also spoke with Dr. Doug Young with the York Institute, who had previously been in charge of the educational programs at Lake County Correctional facility. Based on his review of the petitioner's visitor records at the prison, Appman interviewed the Burchett family and had them testify to show that the petitioner could relate to credible people in a meaningful way. In addition, Appman presented proof that the victim had been a child molester, and Crafton had testified at trial that the environment within the prison was different from the free world and that when a threat was made, an inmate could not move out or call on law enforcement to protect him.

21

Appman obtained the petitioner's TDOC records, but he did not attempt to get school or juvenile records or the transcript of the petitioner's trial for killing his grandmother. While Appman might have discussed with the petitioner his military record, he did not attempt to obtain it. Appman filed a motion requesting the services of a psychiatrist, but the trial court denied the motion. The trial court offered to have the petitioner evaluated by the Tennessee Department of Mental Health, however, counsel declined this invitation. He did not seek funds for a mitigation or sentencing expert.

Under the three factors set forth in Goad, we must first look at the "nature and extent of the mitigating evidence that was available but not presented." Goad, 938 S.W.2d 363, 371. At the post-conviction hearing, the petitioner presented testimony of two friends who knew him in middle school and high school. Both would have been available and willing to testify at the sentencing hearing. He also presented the testimony of a deputy at the Hamblen County Jail who indicated that the petitioner probably saved his life in 1978 when he was trying to break up a fight between two other inmates.

Dr. Gillian Blair, a licensed clinical psychologist, testified on behalf of the petitioner regarding the existence of factors which might have been presented as mitigating evidence at the sentencing phase. Blair concluded that the petitioner was raised in an unstable, often violent and threatening home life where the supervision and structure were inadequate. He was exposed as a child to intermittent explosive violence from his father, who was seriously mentally ill and was hospitalized extensively at a psychiatric hospital between 1969 to 1976. In 1973, there was a restraining order against the father after he held his mother and the petitioner at gun point and had a standoff with the police. In contrast, when the petitioner's father was not being violent, he would be overindulgent and encourage inappropriate behavior. In 1977, the petitioner's father died of hypothermia and exposure. The death certificate indicated that alcohol abuse was a contributing factor in his death.

From the time of his incarceration at age 18, the threatening environment that

the petitioner had endured as a child was present in TDOC. The prison offered little structure or predictability. The petitioner had to be hyper-vigilant, and this was exacerbated by the fact that a number of inmates had access to weapons and that there were a number of assaults in prison.

As a child, the petitioner suffered multiple abandonments and losses. Specifically, his mother abandoned him before the age of one, he essentially lost his father to mental illness, and ultimately he suffered the death of his father. Moreover, the circumstances of his father's death were never explained to him. The petitioner also suffered the loss of his grandfather at the age of 7 or 8, and the separation from his maternal grandparents at the age of 2. He was essentially raised by his paternal grandmother, who was a school teacher.

The petitioner has an extensive drug history. By the time he was an adolescent, he was using a wide variety of drugs. The petitioner admitted the he had dealt drugs extensively as well, to provide a means of obtaining his own drugs and to provide himself some money. His lack of internal controls was exacerbated by his drug use.

Eventually, the petitioner's juvenile problems and drug abuse led to him being sent to Knoxville to live with his aunt and attend high school. While he failed some classes, he did not fail a grade. He eventually dropped out of high school during the eleventh grade. In 1978, the petitioner received his GED at a community college. At age 17, the petitioner joined the Navy from November to December of 1978. He received an honorable discharge, however, the records indicate that he was unable to adjust to military life. The petitioner was described as being overwhelmed by the training and unable to adjust to the emotional pressure. According to the records, the petitioner's attitude toward authority was respectful. Thereafter, the petitioner was incarcerated at the age of 18 and has been incarcerated continually since that time.

The petitioner's medical records were limited. He was shot in the eye at the

23

age of 9. He had several head injuries which lead to a loss of consciousness. One such incident involved a motorcycle accident when the petitioner was 12. The petitioner also suffered sporting accidents at age 13 and 15. In addition, the petitioner was shot in the knee at the age of 16. There is no record of the petitioner having any psychiatric history or treatment before entering TDOC.

According to Blair, the TDOC records indicated that if kept in a safe and structured environment, the petitioner is well-adjusted, presents no management problems, and is not violent. Blair admitted that at the time of the trial, her profession felt that it was difficult to predict future dangerousness and that the key indicator was a past history of violence. She further admitted that this factor would not have weighed in favor of the petitioner.

Blair concluded that the cumulative data, social history, interview, and test results supported personality traits that would have rendered the petitioner vulnerable to prevailing conditions in TDOC during the early 1980s. Those conditions included an unstable, violent, and threatening environment, where supervision and structure were inadequate to the number of inmates. She did not find any sign of cognitive impairment or organic process. Nor did Blair find any suggestion of thought disorder or any type of psychosis.

Blair's primary diagnosis was that the petitioner has an Axis II personality disorder. Tension consistent with an underlying anxiety disorder was also evident. According to Blair, individuals with these profiles tend to be blunt, self-critical, and have inadequate defense mechanisms. The observed clinical profile was consistent with a pattern of chronic maladjustment. These individuals tend to be suspicious, alienated, self-indulgent, and narcissistic, with immature, manipulative, and somewhat aggressive behaviors. Blair agreed with a previous diagnosis of antisocial personality disorder.

In rebuttal, the state presented the testimony of Dr. Theodore H. Blau, a

clinical psychologist from Tampa, Florida. Rather than conduct his own mental tests or evaluations on the petitioner, Blau based his opinion on the psychological evaluation performed by Blair, which he described as excellent. Although he admitted that it was difficult to evaluate someone's mental status from 11 years earlier, Blau made four basic conclusions based on his review and evaluation of the petitioner. First, Blau found no indications that the petitioner, in January 1985, suffered a mental disease or defect which would cause him to lack an understanding of the wrongfulness of his act or to prevent him from conforming to the requirements of the law. Second, Blau found no indications that the petitioner, in January 1985, suffered a mental disease or defect which substantially affected his intellect or judgment. Third, Blau found no indications that the prison conditions in January 1985 caused or exacerbated a mental disease or defect in the petitioner. Finally, Blau found nothing in the record or in the research reviewed to suggest that prison conditions gave the petitioner no alternative other than to protect himself with a "preemptive strike" by murdering the victim.

Finally, the petitioner testified on his own behalf at the hearing. He wanted to testify at the trial and at the sentencing hearing, however, Appman convinced him that testifying would not be in his best interest based on his past convictions. In addition to the information given by Blair about his personal history, the petitioner testified at the hearing that he loved his father, although his father's mental illness made him unreliable at times. His father would sometimes make the petitioner believe that his birth was a factor in his parents' divorce. In attempting to get his father's attention, the petitioner tried to excel in sports, however, his father did not attend many sporting events. When his father would return home from the psychiatric hospital, the petitioner would see an improvement. However, soon the pattern of behavior would repeat itself, and his father would return to the hospital. Because of his father's inconsistent presence in his life, the petitioner felt insecure.

The petitioner's paternal grandmother was the only stable individual in his life. He knew that his grandmother would provide for him. When he was young, the petitioner

25

felt like a burden to his grandmother. She did not display emotion or physical affection, and he felt unloved. As a teenager, the petitioner had no supervision.

At the age of 15, the petitioner was deeply impacted by the death of his father. All hope that his father would become well and share a normal relationship with him was taken away. His grandmother gave him a car at the age of 16, and this increased his access to drugs and to people with similar interests. The petitioner turned heavily to drugs and alcohol to deal with the hurt over his father's death, and he lost interest in school and sports. His drug use became heavier, and he started selling drugs. Drug dealing dominated his life and pulled him away from his old friends. By the time he was 18, the petitioner had a cocaine habit. In the Fall of 1979, the petitioner moved back to Morristown to live with his grandmother. He admitted that during this time, he was doing more drugs than any other time in his life.

At the post-conviction hearing, the petitioner admitted that he killed his grandmother and that he had lied about it at the trial. At the time, lying made it easier to accept his grandmother's death and his involvement. Moreover, he had not wanted to accept punishment. When interviewed by Blair, the petitioner lied about killing his grandmother.

As to the circumstances of Estep's murder, the petitioner testified that he and Freeman bought a $50 bag of marijuana from Estep. The marijuana was low quality, so the petitioner took it back and demanded his money. Estep, who was insulting, would not return the money. At a later time, Freeman and the petitioner went to Estep's room to demand the money. The petitioner threw the marijuana on Estep's bed and asked for the money. There was a fight, and the petitioner took Estep's watch, saying that he would get it back when he gave them the $50. Later that day, the petitioner received word that Estep was intending to kill him and was making open threats. While the petitioner sent Estep several messages saying that he wanted to drop the matter, it was to no avail. In order to protect himself, the petitioner obtained a knife. In the dining hall, the petitioner saw that

26

Estep had a knife in his hands under his dinner tray. The petitioner stood up and Estep walked to the opposite side of the room. This incident lead the petitioner to believe that Estep was serious about killing him, however, he did not check himself into protective custody because he would have lost his privileges and it would have given him a reputation as someone who could not handle his own problems.

On the day of the murder, the petitioner and Freeman entered Guild 5 as soon as the officer left. The petitioner testified that Street was not involved. Only two or three inmates were sitting at a table in the back of the guild. The petitioner went into Estep's room, and Freeman kept watch outside the cell. The petitioner had placed a magazine underneath his shirt with an ace bandage wrapped around it as body armor, and his knife was in his waistband. The petitioner made one last attempt at making peace, but Estep threw coffee in his face. After that, there was a struggle. When the petitioner was able to free himself, he got out the knife and began stabbing Estep. Eventually, the petitioner called Freeman for help. Freeman came into the cell and helped the petitioner stab Estep. When Estep finally quit struggling, the petitioner washed the knives in the toilet and put them under the bed. He then washed his face, and the two left. The petitioner went to his room, took off his clothes, and placed them in a garbage bag, which he placed near the front door for pick up. He then took a shower to wash off the blood. The petitioner claimed that he killed Estep in self defense.

In reviewing the "quality of the proposed testimony," see Henley, 960 S.W.2d 572, 582, it would have been proper proof at a sentencing hearing. As in Henley, however, the evidence does not reveal a "disadvantaged background," nor does it suggest "emotional and mental problems [that make the defendant] less culpable than defendants who have no such excuse." See Brown, 479 U.S. at 544, 107 S. Ct. at 841. As noted above, the asserted mitigating factor in Goad was a recognized mental illness, whereas in the present case, the clinical psychologist diagnosed the petitioner with a personality disorder. See State v. Alvin Robinson, Jr., No. 02C01-9608-CR-00280, slip op. at 9 (Tenn. Crim. App., filed at Jackson, Dec. 3, 1997) (For purposes of defeating premeditation and

27

reducing first-degree murder to a lesser grade, "[t]estimony that a defendant suffers from a personality disorder, rather than a mental disease or defect, fails to establish diminished capacity."), remanded on other grounds, (Tenn. Nov. 9, 1998); see also Strickland, 466 U.S. 668, 700, 104 S.Ct. 2052, 2071 ("considerable emotional stress that did not rise to the level of extreme disturbance" not sufficient in the face of strong aggravating factors to demonstrate a probability that the use of the evidence would have changed the outcome).

Indeed, the proof at the post-conviction hearing showed little positive or redeeming evidence, with the exception of the deputy with the Hamblen County Sheriff's Department who testified that the petitioner had probably saved his life. See Groseclose v. Bell, 130 F.3d 1161, 1170-71 (6th Cir. 1997)(At capital sentencing hearing, counsel failed to use proof that defendant had no criminal record, was active in church, had a positive record of military service, and had plethora of family members willing to testify on his behalf), cert. denied, ___ U.S. ___, 118 S.Ct. 1826, 140 L.Ed.2d 962 (1998).

Moreover, some of the proposed testimony would have been damaging to the defense. Specifically, by delving into the petitioner's background, defense counsel would have necessarily had to consider the daunting prospect that such proposed evidence would have invited cross-examination or rebuttal to show the circumstances surrounding the two murders committed in North Carolina and the murder of his grandmother. The petitioner's grandmother, who was a school teacher, had adopted and raised the petitioner, provided for his material needs, and protected him from his father's psychotic outbursts of violence. It was when the grandmother discovered the prior murders that the petitioner beat her to death. See Rickman v. Bell, 131 F.3d 1150, 1157 (6th Cir. 1997) (finding deficient counsel's performance where he "succeeded in creating a loathsome image for Rickman -- one that would make a juror feel compelled to rid the world of him").

As to the second factor offered in Goad, whether evidence similar to the proposed evidence had already been heard by the jury, Appman presented proof of the

prison conditions throughout the trial and the sentencing hearing. Also, proof of the petitioner having a relationship with normal, law-abiding citizens was shown through the testimony of the Burchetts. However, no proof regarding the petitioner's personal and family background or history was presented at the sentencing hearing. Again, as previously stated, such proof would have potentially opened the door to quite damaging testimony.

The third Goad factor, the competing strength of the aggravating factors, further illustrates that any deficient performance was not prejudicial. See Henley, 960 S.W.2d 572, 582. Here, the jury found three aggravating circumstances which were supported by the proof. Specifically, the jury found that the petitioner had a prior conviction for a felony involving violence, T.C.A. § 39-2-203(I)(2) (repealed 1989), which is an aggravating circumstance that is "more qualitatively persuasive and objectively reliable than others." State v. Howell, 868 S.W.2d 238, 261 (Tenn. 1993). In the present case, the state chose to only present proof of one of the petitioner's three prior murder convictions to support this aggravating circumstance. Moreover, the other two aggravating circumstances, the murder was committed while the petitioner was in lawful custody and the murder was heinous, atrocious, or cruel, T.C.A. § 39-2-203(i)(5) and (8) (repealed 1989), are supported by the proof. See State v. Sutton, 761 S.W.2d 763, 767.

Based on the application of the factors set forth in Goad, the Court finds that the petitioner has failed to demonstrate prejudicial ineffectiveness of counsel in preparing for and conducting further mitigation defense at the sentencing hearing.

© **Failure to Support Motion for Psychological Evaluation**

The petitioner argues that counsel's failure to support his motion for a psychological evaluation, to pursue the psychological evaluation, or to present evidence at sentencing relating to an evaluation were all facially deficient actions that prejudiced him.

29

Again, we find that the post-conviction court properly denied relief on this issue. As pointed out by the post-conviction court, the proof showed that the petitioner refused to assert "mental disease or defect or any diminished capacity as either a defense or in mitigation of the crime or the punishment." The petitioner testified at the post-conviction hearing that he told Appman he did not want to pursue a mental defense. Moreover, the testimony of both clinical psychologists confirmed that the petitioner was not suffering from a mental disease or defect at the time of the offense or the trial. Further, as pointed out by the post-conviction court, if a psychiatrist or clinical psychologist had testified, there would have been a distinct probability that the expert would have been cross-examined about the details of the petitioner's prior episodes of violence, consisting of at least three prior homicides, including the murder of his grandmother. Counsel was given the opportunity to have his client evaluated by the state facility, however, he declined this invitation because of fear that the state would use the unfavorable information regarding the petitioner's past. Based on these facts, we cannot find that the petitioner was prejudiced by counsel's failure to pursue a psychological evaluation. Strickland v. Washington, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067.

**(D) Opening and Closing Argument at the Sentencing Hearing**

The petitioner contends that counsel's failure to prepare or present an opening argument at sentencing, or to prepare and present a coherent closing argument at sentencing on why the petitioner should not be sentenced to death was prejudicial. The petitioner contends that if counsel had done the necessary investigation, preparation, and presentation of a coherent mitigation case, he would have been able to present an opening argument and a coherent closing argument. Initially, this Court notes that a review of the record reveals that defense counsel did in fact present an opening statement at the sentencing hearing.

Regarding counsel's opening argument at the sentencing hearing, the post-conviction court held:

30

The petitioner suggests that the opening statement, consisting of only two pages, was insufficient and he speculates that a more adequate statement may have produced a different result. There is simply inadequate proof of that proposition. By this time, the jury had heard a great deal of evidence about the crime. The defense theory was evident. The petitioner's social history and criminal record, in only 18 years outside of incarceration, was atrocious. There were some very favorable character witnesses for the petitioner. It was a reasonable tactic to limit the damaging effect of the unfavorable circumstances. Much of the favorable evidence today, as shown in the evidentiary hearing, shows the petitioner has matured since the time of trial.

As to the quality of the closing argument at sentencing, the post-conviction court held:

The petitioner makes this claim with the view that his trial counsel could have made a more cogent, compelling argument had he conducted more legal and factual research. The evidentiary hearing did not, however, produce evidence that supports that claim. There is no indication that the result would have been different. Simply too much emphasis has been placed upon trial counsel's role in the sentencing hearing. The problem for the petitioner in this stage of the trial was his prior criminal record which included three prior murder convictions in addition to that of Carl Estep, and confessions for two other, unresolved claims of murder. Even with additional expert and mitigating witnesses, the petitioner has failed to show what could have been said by his counsel to the jury that might have caused a different sentence.

The Court finds that the evidence does not preponderate against the post-conviction court's findings on this claim. See Butler v. State, 789 S.W.2d 898, 899.

### (E) Absence of Co-Counsel

The petitioner contends that counsel was ineffective by failing to request the appointment of co-counsel. He points to the extraordinary burdens imposed on counsel during the pre-trial discovery process and the fact that counsel virtually conducted no factual or legal investigation of possible mitigation.

At the post-conviction hearing, Appman stated that although the trial court offered to appoint co-counsel, he deliberately refused the offer. A paralegal with his office did extensive investigation on this case. Appman also testified that he worked with the

31

attorneys representing the co-defendants. In denying relief on this claim, the post-conviction court held:

> The petitioner had experienced trial counsel who demonstrated a dogged work ethic in the preparations for this trial. That each of the codefendants had two lawyers, all of whom cooperated with the petitioner's counsel, is further evidence that the petitioner was not prejudiced in any way. All testimony suggested the efforts of trial counsel for the petitioner commanded the respect of his colleagues, who looked upon him for guidance and leadership.

The petitioner has failed to show that counsel was ineffective for failing to request co-counsel or that he was prejudiced by that decision. At the time of the trial, Appman had practiced law for several years, trying his first major murder case more than 10 years prior to the petitioner's trial. Appman had also tried several cases in Morgan County and was familiar with the area. In addition, Appman was assisted by his paralegal, and he worked with the attorneys representing the co-defendants. Judge Eblen, who presided over the trial, testified that Appman did not seem hindered by the lack of co-counsel, nor did his defense strategy appear disjointed during the course of the trial. Accordingly, we find that the evidence does not preponderate against the trial court's finding on this issue. See Butler v. State, 789 S.W.2d 898, 899.

### (F) Failure to Object to Jury Instructions

The petitioner contends that counsel's failure to research, object to, file a new trial motion on, or raise on appeal, a number of improper instructions constituted facially deficient performance that was prejudicial.

First, the petitioner contends that defense counsel failed to research and to object at trial, post-trial, and on appeal to the court's preliminary instruction to the effect that "The law with regard to First Degree murder in the State of Tennessee says that those persons convicted of that offense shall receive the death penalty or, if the jury decides that it is appropriate, then the jury will fix a life sentence."

Initially, the Court notes that no such instruction is found at the citation to the record included in the petitioner's brief. See Rule 10(b), Tennessee Court of Criminal Appeals Rules. Regardless, the argument that these jury instructions shift the burden of proof to the defendant to show that a life sentence should be imposed has been rejected by our Supreme Court. See State v. Van Tran, 864 S.W.2d 465, 478 (Tenn. 1993); State v. Bane, 853 S.W.2d 483, 488 (Tenn. 1993). Accordingly, counsel cannot be held deficient for failing to raise the issue.

Next, the petitioner contends that defense counsel failed to research and to object at trial, post-trial, and on appeal to the repeated references in the charge at sentencing and the sentencing verdict form to the requirements of unanimity.

Again, arguments regarding these jury instructions have been repeatedly rejected by our Supreme Court. See State v. Brimmer, 876 S.W.2d 75, 87; State v. Smith, 857 S.W.2d 1, 22-23 (Tenn. 1993); State v. Barber, 753 S.W.2d 659, 670-71 (Tenn. 1988). Thus, counsel was not ineffective by failing to object.

Next, the petitioner contends that defense counsel failed to research and to object at sentencing, post-trial, and on appeal to allowing the aggravating circumstance that the petitioner was in custody at the time of the offense to go to the jury when the trial court did not charge the jury on this aggravating circumstance.

A review of the record reflects that the trial court instructed the jury to consider whether "the murder was committed by the Defendants while they were in lawful custody or in a place of lawful confinement or during their escape from lawful custody or from a place of lawful confinement." Accordingly, the jury was properly instructed, and counsel had no reason to object to an uninstructed jury.

Next, the petitioner contends that defense counsel was deficient because he failed to research and to object pre-trial, post-trial, and on appeal to the ambiguity of the

33

jury instruction on the heinous, atrocious, and cruel aggravating circumstance.

On this issue, despite our Supreme Court's conclusions to the contrary, the post-conviction court acknowledged that the Sixth Circuit Court of Appeals has held that the "especially heinous" instruction as well as the term "depravity of mind" does not meet constitutional safeguards. See Houston v. Dutton, 50 F.3d 381 (6th Cir.), cert. denied, 516 U.S. 905, 116 S.Ct. 272, 133 L.Ed.2d 193 (1995). However, the post-conviction court went on to perform a harmless error analysis pursuant to State v. Howell, 868 S.W.2d 238, and concluded that application of the heinous, atrocious, or cruel aggravating circumstance was harmless beyond any reasonable doubt.

In State v. Williams, 690 S.W.2d 517 (Tenn. 1985), our Supreme Court reversed a sentence of death and remanded for a new sentencing hearing after finding "that the court did not instruct the jury concerning the legal significance of the words 'heinous,' 'atrocious,' 'cruel,' 'torture,' or 'depravity of mind' as those terms are used in the aggravating circumstance defined in T.C.A. § 39-2-203(i)(5)." Id. at 532. The Court found the statute to be constitutional "so long as the abstract terms employed therein are construed and interpreted as we have done in this opinion and other opinions of this Court." Id. at 533. Jury instructions on the definitions are necessary to preclude "a basically uninstructed jury" that "cannot lawfully impose the death penalty," Id. (citing Godfrey v. Georgia, 446 U.S. 420, 429, 100 S.Ct. 1759, 1765, 64 L.Ed.2d 398 (1980)). A review of the jury instructions given at the petitioner's trial reflects that the jury was properly instructed on the necessary definitions.

Whereas, in Houston, the trial court did not instruct the jury on the definitions of any of the terms set forth in the heinous, atrocious, or cruel aggravating circumstance. 50 F.3d 381, 387. In Rickman v. Dutton, 854 F. Supp. 1305, 1309-10 (M.D. Tenn. 1994), the trial court defined the terms "heinous," "atrocious," and "cruel" for the jury but did not define the terms "torture" or "depravity of mind." 854 F.Supp. 1305, 1309-10. In reviewing the instruction, the district court held that the "especially heinous" instruction, even as

limited by the definition of heinous as "extremely wicked or shockingly evil," was unconstitutionally vague. Id. at 1310. The district court also held that the instruction was vague despite the inclusion of the term "depravity of mind," which it also found to be unconstitutionally vague. Id. In contrast, the trial court in the present case instructed the jury on all the definitions required under Williams, and counsel's performance was not deficient in failing to raise this issue.

Finally, the petitioner contends that defense counsel failed to research and investigate, and to prepare proposed instructions at the guilt and sentencing phases based on the federal findings and admitted conclusions of the state's own experts on factual issues bearing directly on the petitioner's assertion of self-defense, on statutory mitigating circumstances, and on non-statutory mitigating circumstances.

As noted by the post-conviction court, a more extensive case could have been presented, however, this is not the standard in reviewing a claim of ineffective assistance of counsel. Previously in this opinion, the Court found that the petitioner had not met his burden of proving ineffective assistance based on counsel's failure to present proof of prior federal proceedings on the issue of prison conditions. The same holds true for counsel's failure to request these jury instructions. This issue is without merit.

### (G) Failure to Object to Prosecutorial Misconduct

The petitioner raises several claims that counsel was ineffective by failing to object to misconduct by the prosecution. The post-conviction court held that the petitioner failed to show any misconduct, and therefore, his claim of ineffective assistance was held to be without merit. While in some instances, the arguments made by the prosecution were improper, we find that the petitioner has failed to show that he was prejudiced by counsel's failure to object to these remarks.

First, the petitioner submits that defense counsel failed to investigate or

research, or to object at trial, post-trial, or on appeal to the prosecution's repeated misstatements in voir dire that the conditions at MCRCF had no bearing on how the law should be applied. While the petitioner cites to the record for the specific instances complained of, he has failed to cite to any authority supporting relief on this issue, and therefore, the issue is deemed waived. See Rule 10, Tennessee Court of Criminal Appeals Rules.

Next, the petitioner contends that defense counsel failed to research or to object at trial, post-trial, or on appeal to the prosecution's statements about Crafton's credibility, not only because such practice was improper generally, but because the prosecution's argument was misleading to the extent that it implied that inmate Crafton's testimony about the dangerous conditions in TDOC was untrue. Specifically, the petitioner complains of two comments made by the prosecutor during closing argument at the guilt phase: "[Crafton] thinks he is a cut above the other prisoners, that he is a man of character, a man of principle a man who wants to live decently and rightly" and "[a]re you going to buy the goods he is trying to sell to you?"

A prosecutor's argument must be supported by evidence introduced at trial and the reasonable inferences to be drawn from that evidence. State v. Beasley, 536 S.W.2d 328, 330 (Tenn.1976). Moreover, a lawyer's personal opinion as to the credibility of witnesses should not be injected into the closing argument. Id. While a prosecutor is an advocate, entitled to pursue his role with thoroughness and vigor, he must also act as the representative of a sovereignty who has an obligation to govern impartially. Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976). Therefore, "improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed.2d 1314 (1935).

In order to determine whether any improper conduct was prejudicial, this Court has set forth five factors to consider:

> (1) the conduct complained of viewed in the context and in light of the facts and circumstances of the case, (2) any curative measures undertaken by the court and the prosecution, (3) the intent of the prosecutor in making the improper statement, (4) the cumulative effect of the improper conduct and any other errors in the record, and (5) the relative strength or weakness of the case.

Judge v. State, 539 S.W.2d 340, 344.

In the present case, the prosecuting attorney's remarks about Crafton were supported by the record. Crafton testified during cross-examination that he had never met another inmate with his principles or character. As to the prosecutor's question to the jury whether it was going to "buy the goods he is trying to sell you," the state also made clear that it was the jury's responsibility to judge the credibility of witnesses:

> [Crafton] was here to give his viewpoints and his expert opinion on prison life. The first thing I would like you to consider is was he credible to you? Listen carefully when the Judge charges as to how to determine someone's credibility and the things that you are entitled to consider, such as respectability, possible bias, whether they really know what they are talking about in the first place.

Furthermore, the jury was charged by the trial court regarding the weight and credibility as to all witnesses. Even if the closing remarks of the prosecutor were improper, which we do not find, we find that the petitioner has failed to demonstrate resulting prejudice.

In a similar complaint, the petitioner contends that defense counsel failed to object at trial, post-trial, or on appeal to the prosecution's argument "Are you willing for the citizens of Morgan County to accept the kind of prison system that [Crafton] seems to think you ought to have," implying that the petitioner and Crafton were responsible for the system-wide violence. While the prosecutor's argument was not supported by the proof, in that Crafton testified as to his impressions of actual prison conditions and not what prison conditions should be, the petitioner has failed to show that this argument was prejudicial. See Judge v. State, 539 S.W.2d 340, 344.

Next, the petitioner contends that defense counsel failed to object at trial, post-trial, or on appeal to the prosecution's argument that the defendants must be guilty because they were the persons whom Worthington immediately placed in administrative segregation. Specifically, the prosecutor argued to the jury:

Now, use your common sense here for a moment. Who was locked up immediately after this body was found and the very first information received? They are sitting right over there. Do you think Mr. Worthington said, "Oh, let's see, we got a dead man here, lock up Street, Sutton and Freeman." Do any of you all believe that?

This argument was clearly inappropriate. A prosecutor should not imply that a defendant is guilty because he is the one who was arrested. See State v. Hicks, 618 S.W.2d 510, 516 (Tenn. Crim. App. 1981) (Improper for prosecutor to argue that because grand jury charged defendant, he must be presumed guilty). See also, United States v. Bess, 593 F.2d 749, 753-54 (6th Cir. 1979) (Improper for prosecutor to suggest that defendant is guilty because he is being prosecuted or has been indicted). However, after reviewing this comment in light of the record, we do not find that it affected the verdict. See Judge v. State, 539 S.W.2d 340, 344. Therefore, the petitioner has not shown prejudice due to counsel's failure to object.

Next, the petitioner contends that defense counsel failed to object at trial, post-trial, or on appeal to the prosecution's argument that "I have not heard one word of Nick Sutton or Thomas Street ever being touched by Carl Estep. I heard a lot of suggestion, but that is all it has been." The petitioner contends that this argument constituted an impermissible comment on his failure to testify. We disagree. The argument did not comment on the petitioner's failure to testify. It was merely a comment on the proof. There was testimony regarding possible threats made by the victim, but there was no proof of the victim physically attacking or hurting the petitioner. This argument does not constitute misconduct, State v. Beasley, 536 S.W.2d 328, 330, and therefore, counsel was not ineffective by failing to object.

38

Next, the petitioner contends that defense counsel should have objected at trial, post-trial, or on appeal to the prosecution's arguments regarding future dangerousness. Specifically, the petitioner argues that an objection should have been made to the following arguments made by the prosecution: "What are you going to do to Nicholas Sutton, Give him a life sentence? Will that prevent there being another Carl Estep?," "Society has certain rights and the State simply asks that you exercise society's right to self-defense. These men are already locked up. Mr. Nicholas Sutton is already serving a life sentence," "[Sutton] was conditioned on the street to kill people. Ladies and gentlemen, we suggest to you that persons who are armed robbers and first degree murderers are already conditioned to kill people," and "When we get to the point that we have done everything possible to protect ourselves and there is nothing else we can reasonably do that would protect ourselves from people like Nicholas Todd Sutton...then we have the right of self-defense and this is where capital punishment comes in."

A capital sentencing jury is not precluded from consideration of the future dangerousness of a particular defendant where such is a relevant factor under a state's capital sentencing law. See Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). Generally, however, our Courts have held that the issue of specific or general deterrence should be avoided by the prosecution in closing argument at a capital sentencing hearing. See State v. Bates, 804 S.W.2d 868, 881-82 (Tenn. 1991); State v. Irick, 762 S.W.2d 121, 131 (Tenn.1988). Specifically, the deterrence argument is usually irrelevant to the aggravating circumstances listed in Tennessee's statute. State v. Bates, 804 S.W.2d at 882. Thus, "unless relevant to some theory raised by the State[']s proof, or the defense, it interjects an element into the jury's considerations not provided for by the law." Id. In reviewing the propriety of argument in a capital sentencing proceeding, the reviewing court must determine whether the prosecutor's comments affected the sentencing decision. State v. Irick, 762 S.W.2d 121, 131. "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." Id. (citing Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985)).

While these comments by the prosecution were obviously inappropriate, based on a review of the entire record, we do not find that the jury's decision was affected. Accordingly, the petitioner has failed to show prejudice based on counsel's failure to object.

Finally, the petitioner contends that defense counsel failed to move to strike or to dismiss the death notice because given the state's longstanding indifference to violence in TDOC and its causes, given the 1985 findings of Mr. Wood, and given the undisputed fact that the victim had repeatedly threatened the petitioner and refused offers of peace, the petitioner submits that a death notice in this case violated the due process and the cruel and unusual punishment guarantees of the United States and Tennessee constitutions. The underlying issue regarding prison conditions has been addressed in this opinion, and we do not find that counsel was ineffective for failing to move to strike or to dismiss the death notice.

**(H)  Failure to Raise Issues on Direct Appeal**

The petitioner contends that defense counsel was ineffective on appeal because he failed to research the law, investigate the facts, perfect the record, and raise important issues on appeal. He points to each of the issues raised in his brief and in the amended post-conviction petition, and as to each fact and legal argument raised. Because we have held that the petitioner's claims are without merit, we find that his claim of ineffective assistance based on counsel's failure to raise these issues on direct appeal is without merit.

**(I)  Cumulative Effect**

Finally, the petitioner contends that the cumulative effect of counsel's repeated, deficient failures rendered his trial and sentencing fundamentally unfair. Based on our review of the issues raised regarding ineffective assistance of counsel, we reject the petitioner's contention that the cumulative effect of any errors found would require reversal.

## V. False Testimony and Misleading Argument
## Regarding Conditions at MCRCF

The petitioner contends that during the trial, the state falsely portrayed inmate safety and security at MCRCF. On this issue, the post-conviction court held:

> The petitioner has failed to meet his burden of proof. There is insufficient evidence to establish that the state misrepresented the level of safety and security for inmates at the Morgan County Regional Correctional Facility at the time of the offense. There is no indication that the witness, James Worthington, inappropriately misled the petitioner or his counsel in this regard. Moreover, the petitioner was in a position to have known of these circumstances, divulge them to his counsel, and supply possible witnesses in support of his claims. For example, the petitioner presented a witness at trial, Carl Crafton, who testified at length about prison life and the conditions that existed in the Department of Corrections at the time of this offense.

At trial, Worthington testified regarding his perceptions of the prison environment at MCRCF. Proof that Worthington was aware of Wood's report does not make his testimony regarding his own perceptions of the prison conditions false. Cf. Brotherton v. State, 477 S.W.2d 522, 523-24 (Tenn. Crim. App. 1971)(doctor's opinion testimony regarding whether defendant appeared sober is not made out to be perjury by results of blood test reflecting alcohol content of .014 in defendant's blood).

## VI. False Testimony Regarding Prior Statement of Inmate Lumbert

The petitioner contends that a handwritten memo regarding inmate Gary Lumbert's statement taken by Worthington was not included in the state's files and was only produced a few days prior to the post-conviction hearing. The petitioner submits that the statement was manufactured, that it constituted false testimony, and that the testimony was material to the proceedings. The petitioner further contends that the post-conviction court erred by failing to address this issue.

While it does not appear that the post-conviction court addressed this specific issue, we find that it is without merit. Worthington's notebook contained notes from all the

interviews conducted during the investigation of the murder, however, a memo regarding an interview of Lumbert on March 13, 1985, was not included in the notebook, nor was Lumbert's name included on the lists provided to defense counsel. Lumbert eventually testified at trial on behalf of co-defendant Street. Before the post-conviction hearing, the memo regarding the interview with Lumbert was found in Worthington's miscellaneous file. Worthington testified that the statement was not in his notebook because it had been misplaced.

Included in the state's file were notes written by General Harvey during Lumbert's testimony at trial. According to General Harvey, Worthington was telling the prosecutors that Lumbert had given different answers during his interview that were contrary to his testimony. General Harvey took notes so they could look into the matter. The notes indicated that Lumbert had told Worthington that Freeman and Street were bragging about the murder, however, the memo regarding an interview of Lumbert indicated that Lumbert had stated that the petitioner and Street were the ones bragging about the murder. General Harvey did not know if he had misinterpreted what Worthington was saying or if Worthington had misspoken at the time.

A review of the trial transcript also refutes the petitioner's claim. When Worthington was cross-examined by defense counsel, he indicated that inmate Lumbert's statement had been recorded and the trial court ordered the state to produce that statement for the purposes of cross-examination. Accordingly, defense counsel was given an opportunity to review the statement at the time of the trial. This supports a finding that the statement was available and reviewed at the time of trial and was not falsely manufactured for purposes of the post-conviction hearing.

## VII. **Brady** and **Giglio** Claims

The petitioner contends that the post-conviction court erred in finding that he had failed to establish claims under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, and

Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763. Specifically, the petitioner submits that the proof showed that prior to trial, the state was in possession of inconsistent statements of the four inmate witnesses who testified for the state and the statements of those four inmates that conflicted directly. The petitioner further submits that the proof showed that the state was aware of the findings in Wood's report on MCRCF, that the information was not provided to defense counsel, and that Worthington's testimony at trial directly conflicted with Wood's findings and conclusions.

On the petitioner's Brady claims, the post-conviction court held that the petitioner failed to rebut the statutory presumption of waiver and, in the alternative, failed to meet his burden of proof to establish that the state violated any of the discovery guidelines which would qualify him for relief. As to the petitioner's Giglio claim, the post-conviction court held that he "failed to meet his burden of proof to establish any violation of the Giglio rule. The proof simply does not establish that the state made any promises of immunity or leniency to the witnesses in exchange for testimony. There was no evidence that the prosecution withheld any documents or information of any kind that would tend to impeach the credibility of the state's witnesses."

In Brady v. Maryland, the United States Supreme Court held that any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97. The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible at trial. State v. Marshall, 845 S.W.2d 228, 232-33 (Tenn. Crim. App. 1992). In Giglio v. United States, 405 U.S. 150, 154-55, 92 S.Ct. 763, 766, the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule. See also, United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

Before an accused is entitled to relief under this theory, he must establish

several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. See United States v. Bagley, 473 U.S. at 674-75, 105 S. Ct. at 3379-80; Brady v. Maryland, 373 U.S. at 87, 83 S. Ct. at 1196-97; State v. Edgin, 902 S.W.2d 387, 390 (Tenn. 1995); Workman v. State, 868 S.W.2d 705, 709 (Tenn. Crim. App. 1993); Strouth v. State, 755 S.W.2d 819, 828 (Tenn. Crim. App. 1986). Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. United States v. Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.

In order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, Edgin, 902 S.W.2d at 390. There must be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 1566). The Court in Kyles urged that the cumulative effect of the suppressed evidence be considered to determine materiality. 514 U.S. at 436, 115 S.Ct. at 1567.

The state is not required to disclose information that the accused already possesses or is able to obtain, State v. Marshall, 845 S.W.2d 228, 233, or information which is not possessed by or under the control of the prosecution or another governmental agency. Id.

On appeal, the petitioner makes no specific claim that the state suppressed information regarding favors or immunity offered to witnesses. However, a review of the record confirms the post-conviction court's finding that the petitioner failed to show that any favors or immunity were given to any of the witnesses in exchange for their testimony. Worthington and the assistant district attorney generals who prosecuted the petitioner's

44

case testified that at the beginning, they agreed that there would be no promises to inmates in exchange for testimony. Worthington believed that all the inmates who testified had already been paroled at the time of the trial with the exception of Scates. After the trial, as a courtesy, he wrote Scates a letter of appreciation for his testimony. At best, the proof showed that the state offered to protect any inmates willing to testify from possible retaliation.

The petitioner submits that the state should have provided the statements of the four inmates who testified at trial because the statements were inconsistent. The statements of the four inmates were suppressed by the state before trial, however, the defense received the statements as Jencks material after each inmate testified and before cross-examination.

In State v. Caughron, 855 S.W.2d 526 (Tenn. 1993), our Supreme Court held that "delayed disclosure requires an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." Id. at 548. In United States v. Ingraldi, 793 F.2d 408, 413 (1st Cir.1986), the Court held that defense counsel cured a potential Brady violation by failing to move for a continuance and then thoroughly cross-examining the witness.

In the present case, the state provided defense counsel with copies of the inmates' statements after each inmate testified. Moreover, the trial court gave defense counsel ample opportunity to review the statements before cross-examining each witness. Thereafter, defense counsel was given an opportunity to cross-examine the witnesses and point out any inconsistencies in their statements and testimony. Accordingly, under Caughron, we find that defense counsel eliminated any Brady violation with regard to prior statements of the inmates who testified on behalf of the state.

Finally, the petitioner contends that the state was required to disclose Wood's report regarding prison conditions at MCRCF. As previously stated, the state is not

45

required to disclose information that the accused is able to obtain. State v. Marshall, 845 S.W.2d 228, 233. Here, the petitioner failed to show that the evaluation and report prepared by Wood, Report on conditions at selected Adult Correctional Facilities in the Tennessee Department of Corrections (June 1985), was unavailable to defense counsel.

## VIII. Constitutionality of the Death Penalty Statutes

The petitioner raises several constitutional challenges to T.C.A. §§ 39-2-204 and -206 (repealed 1989). To the extent that the petitioner challenged the constitutionality of the death penalty statutes on direct appeal, Sutton, 761 S.W.2d 763, 768, these claims have been previously determined. See T.C.A. § 40-30-112(a) (1990). Otherwise, the issues have been waived. See T.C.A. § 40-30-112(b)(1) (1990). Regardless, our Supreme Court has held repeatedly that the death penalty statutes are constitutional.

Initially, the petitioner contends that the death penalty statutes fail to meaningfully narrow the class of death eligible defendants. Specifically, he argues that the aggravating circumstance set forth in T.C.A. § 39-2-204(i)(5) (repealed 1989), that the murder was heinous, atrocious, or cruel, is vague and overbroad. Acknowledging that this issue has been addressed by our Supreme Court in State v. Williams, 690 S.W.2d 517, 526-30, the petitioner submits that the opinion was in error.

As an intermediate appellate court, it is our duty to apply the law as promulgated by the Legislature or as announced by our Supreme Court. It is beyond our statutory function to overrule a holding of our Supreme Court, and we are bound to follow the holding in Williams under the doctrine of stare decisis. See Reimann v. Huddleston, 883 S.W.2d 135, 137 (Tenn. App. 1993). Moreover, our Supreme Court has repeatedly upheld its decision in Williams, rejecting the argument that this aggravating circumstance was unconstitutionally vague or overbroad. See State v. Black, 815 S.W.2d 166, 181-82 (Tenn. 1991); State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988).

Next, the petitioner contends that the death penalty is imposed in a capricious and arbitrary manner. Specifically, he contends that the death penalty statute is unconstitutional because it requires that the jury be instructed that it must agree unanimously in order to impose a life sentence and is prohibited from being told the effect of a non-unanimous verdict. While admitting that this jury instruction has been upheld by our Supreme Court on numerous occasions, the petitioner contends that the Supreme Court has never considered the possibility that juries may act arbitrarily because of confusion regarding the consequences of a deadlock. Again, our Supreme Court has held this portion of the statute to be constitutional, see State v. Brimmer, 876 S.W.2d 75, 87, State v. Smith, 857 S.W.2d 1, 22-23 (Tenn. 1993), and State v. Barber, 753 S.W.2d 659, 670-71, and this Court declines the petitioner's invitation to reconsider its constitutionality.

Next, the petitioner contends that the jury instructions imply that jurors are required to agree unanimously to a life verdict and to the existence of mitigating circumstances in violation of Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and McKoy v. North Carolina, 494 U.S. 433, 110 S.Ct. 1227, 1233, 108 L.Ed.2d 369 (1990). These arguments have been rejected by our Supreme Court. See State v. Brimmer, 876 S.W.2d 75, 87; State v. Thompson, 768 S.W.2d 239, 251-52 (Tenn. 1989); State v. Bates, 804 S.W.2d 868, 883.

Next, the petitioner contends that the appellate review process is constitutionally inadequate in its application. Specifically, the petitioner contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts is inadequate and incomplete, and because the appellate courts' methodology is flawed. These arguments have all been rejected. See State v. Brimmer, 876 S.W.2d 75, 87-88; State v. Cazes, 875 S.W.2d 253, 270-71 (Tenn. 1994).

Finally, the petitioner contends that the statutorily mandated proportionality

47

review is conducted in violation of due process. Our Supreme Court has held that the appellate review provided for in the statute affords a meaningful proportionality review. See State v. Brimmer, 876 S.W.2d 75, 87-88; State v. Cazes, 875 S.W.2d 253, 270-71. Moreover, the petitioner's claim that our Supreme Court has never found a death sentence to be imposed in a disproportionate manner is untrue. In State v. Branam, 855 S.W.2d 563 (Tenn. 1993), the Supreme Court found the death penalty to be disproportionate and reduced the defendant's sentence to life. Id. at 570-71. The petitioner's claims regarding the constitutionality of the death penalty statutes are waived, previously determined, and without merit.

## IX. Imposition of Death Penalty Arbitrary and Capricious

Finally, the petitioner contends that because the state failed to provide safe and constitutional conditions in prison at the time of the murder, imposition of the death penalty would be arbitrary, capricious, and fundamentally unfair. This issue was previously determined by our Supreme Court on direct appeal. The Court held that "imposition of the death penalty by the jury was neither arbitrary nor excessive or disproportionate to the penalty imposed for similar crimes." State v. Sutton, 761 S.W.2d 763, 768.

## X. Conclusion

After thoroughly reviewing the record and the law applicable to the issues raised in this appeal, we find that the petitioner has failed to prove his allegations by a preponderance of the evidence. State v. Kerley, 820 S.W.2d 753, 755 (Tenn. Crim. App. 1991). Accordingly, we affirm the judgment of the trial court.

The petitioner's sentence of death by electrocution shall be carried out on August 31, 1999, unless otherwise stayed by an appropriate order.

_____
JOHN K. BYERS, SENIOR JUDGE


CONCUR:


_____
JOE D. DUNCAN, SPECIAL JUDGE


_____
TERRY L. LAFFERTY, SENIOR JUDGE